UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

TERESE MEAGHER,

              Plaintiff,
                                   <u>COMPLAINT</u>

   - against -

STATE UNIVERSITY CONSTRUCTION FUND,           1:17-cv-903 (GTS/CFH)
ROBERT HAELEN,
       in his official and individual capacity, and
JOANNE DI STEFANO,
       in her official and individual capacity,           JURY TRIAL DEMANDED


                    Defendants.
———————————————————————————

      Plaintiff Terese Meagher, by her attorneys, Tabner, Ryan & Keniry, LLP, as and for her

Complaint against Defendants State University Construction Fund ("Fund"), Robert Haelen, and

JoAnne Di Stefano (collectively, "Defendants") alleges:

      1.      This action arises from Defendants' discriminatory and retaliatory conduct against

Plaintiff.  From her hiring by the Fund in 2009 as Associate Counsel, Plaintiff performed ably,

enjoyed positive performance reviews and received increased compensation for her positive work.

      2.      Following the departure of the Fund Counsel (and Plaintiff's long-time supervisor)

in March 2015, Plaintiff carried an extremely burdensome workload.  Plaintiff met with Defendant

Haelen, the General Manager of the Fund, and expressed the toll upon her and her desire to spend

more time with her two young daughters.  Haelen assured Plaintiff that he would address the

situation.  Defendant Di Stefano, whom Haelen hired to replace the prior Fund Counsel in August

2015, gave Plaintiff similar assurances.

3.      As set forth herein, however, Haelen and Di Stefano failed to fulfill those assurances.  To the contrary, Di Stefano became increasingly belligerent and made humiliating remarks about Plaintiff's desire to spend more time with her daughters, and also subjected Plaintiff to arbitrary changing work demands and constant criticism.

4.      When Plaintiff spoke with Haelen about Di Stefano's conduct, he attempted to dissuade her from filing a complaint.  Nonetheless, with the conduct continuing, Plaintiff made a formal complaint to Mary Jo Lais, the Fund's Director of Human Resources throughout the relevant time frame.

5.      Instead of promptly investigating, Defendants proceeded to take a number of retaliatory actions against Plaintiff, while continuing to subject her to a hostile work environment. Among other things, she was isolated and excluded from meetings and communications with staff necessary to perform her job functions.  Defendants, moreover, made no meaningful investigation.

6.      Defendants' conduct has caused great harm to Plaintiff's physical and mental health.  Plaintiff has been out of work for over one year, being forced to exhaust her vacation and sick time and to receive reduced compensation while exhausting her 'sick bank' time.  She faces the loss of benefits, loss of accrual of her pension benefits and other financial harms as a direct result of Defendants' conduct.

7.      As such, Defendants have engaged in discrimination based on gender and family status and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the New York State Human Rights Law, § 296, et seq. ("NYSHRL").  Defendants have also violated 42 U.S.C. § 1983 by depriving Plaintiff of her right to equal protection and

substantive due process under the Fourteenth Amendment to the United States Constitution and by retaliating against her for exercising her rights under the First Amendment to the United States Constitution.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, Title VII and 42 U.S.C.A. § 2000e-5(f) and under the Court's supplemental jurisdiction to hear claims arising under State law.

9.     Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(a) and Title VII, and 42 U.S.C.A. § 2000e-5(f) as the Claimant's place of employment was within the District and the alleged acts of discrimination, retaliation, and other deprivations of rights occurred within the District.

10.     On or about December 22, 2016, Plaintiff submitted a charge with the Equal Employment Opportunity Commission ("EEOC") alleging, among other things, the violations of Title VII alleged herein.

11.     On May 18, 2017, the United States Department of Justice, pursuant to a memorandum of understanding with the EEOC, issued a right-to-sue letter, and Plaintiff's counsel received the letter on or about May 25, 2017 (Exhibit 1, hereto).

12.     This action is commenced within ninety days of Plaintiff's counsel's receipt of the right-to-sue letter.

**PARTIES**

13.     Plaintiff Terese Meagher is a resident of Albany County.  She has been employed by the Fund since approximately June 2009 as Associate Counsel.

14.     Plaintiff is an "employee" of the Fund within the meaning of 42 U.S.C. § 2000e and New York Executive Law § 292(6) and is thus afforded protection against discriminatory employment practices.

15.     Defendant Fund is a public benefit corporation organized under the laws of the State of New York, as set forth in Education Law §§ 370-84, with its principal offices at 353 Broadway, Albany, New York 12246 ("353 Broadway").  Among other things, the Fund provides academic buildings and other facilities to the State University of New York.

16.     Defendant Robert Haelen has been at all times relevant to the conduct set forth herein the General Manager of the Fund.

17.     Defendant Joanne Di Stefano has been at all times relevant to the conduct set forth herein the Deputy Counsel of the Fund.

18.     The Fund is an employer with the scope of Title VII and the NYSHRL, with more than 100 employees at all relevant times.  Haelen and Di Stefano each (i) constitute an employer under the NYSHRL in that they exercised supervisory and decision-making authority with respect to Plaintiff's employment; and (ii) directly pariticpated in, and aided and abetted, the discriminatory practices set forth herein.

4

## FACTUAL SUMMARY

A.   **Plaintiff's Employment at the Fund through August 2015**

19.    Plaintiff was hired by the Fund as Associate Counsel in or around 2009.  The position is classified as "Management Confidential" pursuant to the State's categorization of employees.

20.    Prior to being employed by the Fund, Plaintiff worked in private sector positions and gained extensive experience in litigation, among other things.

21.    Plaintiff's responsibilities throughout her tenure included, among other things, oversight of threatened and pending litigation and advising the Fund on a number of legal issues. She also assisted the Fund in communicating with the Fund's trustees and at times acted as secretary at trustee meetings.

22.    At the time of her hiring, Plaintiff reported directly to the then-Fund Counsel, and continued to do so until his tenure ended in or around March 2015.

23.    Plaintiff was on maternity leave from July through November 2009.

24.    After returning from maternity leave in or around November 2009, Plaintiff worked at 80%, with a four-day work week through November 2011.

25.    In or around November 2011, Plaintiff switched to full-time work, based on discussions with the then-Fund Counsel that the Fund's senior staff would need to see her working at 100% in order for her to be considered for promotions to Deputy Counsel and eventually Fund Counsel.  Plaintiff then moved to a 7:30 a.m. to 3:30 p.m. schedule.

26.     The suggestion that Plaintiff pursue advancement reflected the Fund's great satisfaction with her work.  She received positive work performance reviews and annual salary increases, and in February 2012 Haelen approved a merit bonus.  He added in a February 9, 2012 letter regarding the merit bonus, "Your extra effort has not gone unnoticed, and I look forward to working with you in the coming year."  In a March 5, 2014 letter, Haelen informed Plaintiff that "[a]s a result of your work performance," she would receive increased compensation.  He added, "I am grateful for the contributions you are making to the [Fund]."  He provided similar letters accompanying notices of raises on October 20, 2014 and June 3, 2015.

27.     With the retirement of the Fund's Counsel in March 2015, Plaintiff was the sole in-house counsel for the Fund.

28.     In May 2015, Plaintiff was appointed Secretary to the Fund's Board of Trustees and functioned as an officer of the Fund, and in June 2015, Plaintiff was notified of her annual salary increase.

**B.      Plaintiff's Requests Regarding Work and Compensation**

29.     While Plaintiff had been enjoying positive reviews and advancement based upon her performance, Plaintiff was now working excessive hours, frequently working into the night and weekends.  The demanding work schedule put a strain upon Plaintiff, particularly given her parenting obligations.

30.     On or about July 20, 2015, Plaintiff met with Haelen in his office.  She requested his assistance in addressing her excessive work hours and its effect on her parenting obligations,

among other things.  Haelen said that he wanted Plaintiff to work a regular work week and that he was working with Human Resources to provide immediate staffing help.

31.      In the July 20, 2015 meeting, Plaintiff also raised the issue of compensation for excessive hours that she had been working.  In particular, she noted that the Fund's Board of Trustees had passed a resolution in 1999 specifically providing that Management Confidential employees who worked in excess of 37.5 hours per week would be entitled to credit for the excess time ("1999 Resolution").  Haelen said that he would look into the issue and get back to Plaintiff. Haelen also told Plaintiff to show Lais the hours that she had worked in excess of 37.5 hours per week.

32.      In a meeting with Plaintiff on or about August 7, 2015, Haelen advised Plaintiff that Di Stefano, then the Corporate Integrity and Ethics Officer, was being brought into the legal department as Deputy Counsel (and therefore Plaintiff's direct supervisor).

33.      Haelen also said that he thought that the role of Secretary to the Board of Trustees was too much work on top of Plaintiff's other responsibilities and that he would be removing her from that position (although she remained Secretary until April 2016).  Haelen also said that he understood from their July 20, 2015 discussion that Plaintiff was struggling with work and home balance, that Plaintiff had a long career ahead of her at the Fund and that he had given increased compensation for her hard work and that he did not want her to burn out.

34.      Plaintiff explained that she had originally worked at 80% time, and had increased to 100% based on an expectation about her career path at the Fund.  She said that with her not

being promoted to Deputy Counsel, she wanted to return to her original 80% schedule.  Haelen said that he would confer with Di Stefano and Lais and get back to Plaintiff.

35.     Around this time, Di Stefano began her role as Deputy Counsel.  Although she did not have the title of Fund Counsel, for all practical purposes, she held the responsibilities of such. She had direct supervisory responsibility over Plaintiff, including, but not limited to, the authority to assign work to Plaintiff, review Plaintiff's work, and control Plaintiff's interaction with Fund personnel and outside parties.   In addition, Di Stefano's approval was required for any modifications to Plaintiff's standard full-time work schedule.

36.     Plaintiff and Di Stefano worked in close proximity to each other in the Fund's executive offices at 353 Broadway, with their offices separated only by a conference room. Haelen's office was across from Plaintiff's.  On a typical workday, Plaintiff would see each Defendant on numerous occasions.

37.     In initial meetings on or about August 10 and 13, 2015, Plaintiff reiterated to Di Stefano the work-family concerns that she had raised in her July 20 and August 7 meetings with Haelen.  She even gave an example of having to review legislation on a weekend when she was taking care of her family and needed to do the work after putting her children to sleep in the evening.  In these meetings, Di Stefano assured Plaintiff that her workload would be made more manageable and that she was encouraged to take her full vacation time.

38.     Despite her continued positive performance and the assurances from Haelen and Di Stefano about a reduced workload, however, Plaintiff's workload continued to be excessive.  In

addition, by November 2015, she still had not received any response to her August 7, 2015 request to return to an 80% schedule.

39.     In a meeting with Di Stefano on or about November 10, 2015, Plaintiff noted that she still had not received a response to her request to return to the 80% work schedule.  She also raised the issue of her right to compensation pursuant to the 1999 Resolution for the excessive time that she had worked that she had raised with Haelen on July 20.  Plaintiff suggested, for example, that she could use those extra hours to take time off to be with her children.  Di Stefano (who said that she had heard about Plaintiff's request, but was not aware that it was an actual request) said that she would check on the status of Plaintiff's request regarding the 80% work schedule and that Plaintiff should save her time sheets regarding the excessive hours issue.

### C.     Defendants' Denial of Plaintiff's Requests and Plaintiff's Modified Requests

40.     Di Stefano and Lais met with Plaintiff on December 7, 2015.  With regard to Plaintiff's request, pursuant to the 1999 Resolution, for compensatory time for the excessive hours that she had worked, they told her that Plaintiff was not entitled to compensatory time off for the excessive hours that she had worked.  Neither Di Stefano nor Lais offered a rationale for the Fund's refusing to follow the 1999 Resolution.  They cited a revision to the Employee Handbook.  The Handbook, however, while setting conditions to compensatory time for certain employees, did not purport to rescind the 1999 Resolution.

41.     When Plaintiff explained that her time sheets reflected her time in and out and therefore reflected that she had worked excessive hours, Di Stefano said that Plaintiff was not to record on her time sheets any time worked in excess of her full-time week.

9

42.     By this point, Plaintiff continued to work excessive hours, and Plaintiff's concerns about time to care for her daughters had not been addressed.  At Di Stefano's suggestion, Plaintiff tallied her hours and realized that she could take time off and still meet her full-time obligation. In light of Defendant's position, Defendant modified her request to afford her a small amount of time off.

43.     On December 23, 2015, Plaintiff met with Di Stefano and requested that she be permitted to use her own time to take off every other Tuesday (for two hours) and every other Thursday (opposite weeks) to spend time caring for her daughters.   Plaintiff reviewed the days for which she would be requesting time off on a calendar record that she had marked up.  Di Stefano requested Plaintiff e-mail the requested Tuesday / Thursday hours to her.  Later that day, Plaintiff e-mailed Di Stefano her requested hours off and the marked-up calendar with the requested Tuesday and Thursday dates specified, starting Jan 12, 2016.

44.     In a January 7, 2016 meeting with Plaintiff, Di Stefano said that Haelen and she had no problem with Plaintiff's requested time off on Tuesdays and Thursdays.  She also said that she wanted to know what work was on Plaintiff's plate.

45.     Based on the January 7, 2016 discussion, it was Plaintiff's understanding that despite the Fund's refusal to accommodate her request for an 80% work schedule or to compensate her for the many excessive hours that she had worked in the preceding months, the Fund was at least agreeable to her modest request for time off on Tuesdays and Thursdays to care for her children, and that the larger issue of her substantial work load would finally be addressed.

46.     In response to Di Stefano request to know what was on Plaintiff's plate, Plaintiff provided to Di Stefano on January 11, 2016 a list of the matters on which she was working.

47.     Based on these communications, Plaintiff proceeded with her scheduled two hours off on January 12, 2016, as reflected on the marked-up calendar that Plaintiff had provided to Di Stefano.

### D.      Defendants' Reversal and the Hostile Conduct toward Plaintiff

48.     Notwithstanding Defendants' professed approval of Plaintiff's requested time off and promise to address Plaintiff's workload, Di Stefano reversed course again immediately after Plaintiff began with her time off and became increasingly hostile and demeaning toward Plaintiff.

49.     In a meeting on January 28, 2016, Di Stefano confronted Plaintiff in a hostile manner.  She began the discussion by asking Plaintiff if she wanted to continue to work at the Fund, and Plaintiff said, "Yes."  Di Stefano then said that she was "personally and professionally offended" by the worklist that Plaintiff had e-mailed to her.  At the meeting, Plaintiff told Di Stefano that she had spent a lot of time developing the worklist to accurately reflect Plaintiff's work flow, and Di Stefano abruptly remarked that she would not even comment.  Plaintiff also presented Di Stefano with a new format of worksheets breaking down the work tasks, but Di Stefano said that it was not helpful.  Plaintiff also provided Di Stefano with a log of pending litigations, but Di Stefano said that that, too, was not helpful.

50.     The January 28 discussion left Plaintiff confused and humiliated.  While she had worked diligently to provide detail on her matters based on Haelen's and Di Stefano's professed

concern for her workload, she was then subjected to arbitrary and humiliating comments for providing the information.

51.     Moreover, the timing of the comments just after she began her agreed-upon limited weekday leaves, combined with Di Stefano's confrontational question as to whether Plaintiff still wished to work at the Fund, further humiliated her.

52.     At the conclusion of the January 28, 2016 meeting, and after Di Stefano had rebuffed Plaintiff's attempts to explain her work flow, Plaintiff protested that she had previously met with Haelen regularly to discuss her workflow. Di Stefano said that she would meet weekly with Plaintiff.

53.     Di Stefano, however, continued with her arbitrary conduct toward Plaintiff. She cancelled what was to be their first weekly meeting to discuss Plaintiff's workflow. On February 3, 2016, Plaintiff reminded Di Stefano that she would be taking off time the next day, Thursday, as previously agreed-upon. Di Stefano said that she had never approved the time off (when in fact she had), but then said that Plaintiff could take the previously approved time.

54.     Di Stefano also said that she wanted Plaintiff to provide an analysis of Plaintiff's workflow. Plaintiff was perplexed, and reminded Di Stefano that they had just agreed that the upcoming weekly meeting would be to discuss Plaintiff's workflow. Di Stefano reversed course, however, and said that that was not the case. Given Di Stefano's derogatory comments about the workflow information that Plaintiff had provided at their January 28, 2016 meeting, Plaintiff asked if Di Stefano had a format that she could use so that she could provide the workflow information in a format that Di Stefano wished. Di Stefano said that she did not.

55.     The planned weekly meeting on February 9, 2016 did proceed, but Di Stefano's arbitrary, hostile and demeaning conduct continued.  She began the meeting by stating that she had made clear in December that she was not approving Plaintiff's requested time off on Tuesdays and Thursdays.  Plaintiff said that that was not her understanding and that she would not have given her daughters the false expectation that she would be with them on those days.  She also expressed concern that the window before her youngest daughter was to begin school full-time in September was dwindling and that she wanted to get the workflow issue resolved (as Haelen and Di Stefano had been promising for months).  Plaintiff also expressed confusion over Di Stefano's criticism and lack of guidance on the kind of workflow report that she wanted.  Di Stefano said that Plaintiff had until her next scheduled Thursday time off (i.e., in ten days) to prepare a workflow report.

56.     Di Stefano continued with a number of demeaning comments, stating in substance, among other things, that:

> (i)     she works every night and weekend to what is likely the destruction of her personal life;
>
> (ii)    when she was raising her daughter, she had taken a much lower paying job at a state agency to have time to spend with her daughter; and
>
> (iii)   "wouldn't it be nice if we could go home and eat dinner with our families."

When Plaintiff explained that she had originally worked part-time at the Fund and had moved to full-time only because of the senior staff's concerns, Di Stefano abruptly retorted that she did not care.

13

57.     On Tuesday, February 23, 2016, Plaintiff took her scheduled two hours off, but then worked late and updated her workflow report.  Di Stefano cancelled their weekly meeting that was to take place that day.

58.     On February 29, 2016, Di Stefano and Plaintiff met with Fund staff on a pending litigation matter.  After the meeting, Di Stefano criticized Plaintiff's role in the meeting.  Plaintiff said that she would like to meet to review her workload, and Di Stefano did agree to meet on March 1, 2016.

60.     Far from affording Plaintiff the opportunity to at last obtain clarity and relief on her workflow, however, Di Stefano used the March 1 meeting to attack Plaintiff yet again.

61.     In the meeting on March 1, 2016, Di Stefano told Plaintiff that she had been embarrassed about how Plaintiff had conducted herself in a recent meeting, that Plaintiff had taken too long in a recent meeting with Haelen's deputy and that Plaintiff needed to spend less time on assignments.

62.     Moreover, Di Stefano demeaned Plaintiff yet again concerning her work hours.  She said that she needed to demonstrate that the legal department's work would be done and made it clear that nights and weekends may be involved.  Di Stefano also said that Plaintiff's time off on Tuesday and Thursday afternoons was "temporary."  When Plaintiff reiterated that Di Stefano had told her to "proceed" with those days, Di Stefano made a comment about Plaintiff's having had an emotional response when it was previously discussed.

14

63.     At this point in the March 1, 2016 meeting, Plaintiff started crying and looked down.  Di Stefano then put both hands on the table, and in an intimidating manner leaned over the table at Plaintiff while repeatedly saying, in substance:

> "Look at me, look at me."  Plaintiff then looked up, and Di Stefano
> said, "I want to see if you are listening to me."  Plaintiff, humiliated,
> responded, "I understand Jo Anne."

64.     The following day, March 2, 2016, Di Stefano informed Plaintiff by e-mail that she would need to make her requests for time off weekly, as opposed to the standing arrangement to which Di Stefano had previously agreed.  Di Stefano also e-mailed Plaintiff, two legal assistants and Haelen's assistant approving Plaintiff's request for time off the following day, but directed the legal assistant not to record Plaintiff as being out of the office on Di Stefano's calendar until Di Stefano approved the request.

65.     While Plaintiff continued to provide Di Stefano notice of her requests, Di Stefano still acted arbitrarily and with hostility toward her.  For example, on March 7, 2016, Di Stefano told Plaintiff that she needed to attend a meeting the next morning, even though Plaintiff had already requested time off.  When Plaintiff protested that she did not have childcare lined up, Di Stefano said that she had been working nights and had worked the whole weekend.  Di Stefano then sent an e-mail to Plaintiff and support staff stating that Plaintiff could take the time off the next day due to Plaintiff's need for childcare, but that she would respond to Plaintiff's other pending requests later.  The communication to the staff singling out Plaintiff caused further humiliation.

15

66.     Upon information and belief, by contrast, Di Stefano's responses to other staff requests for time off were prompt and without protest or castigation.

67.     Di Stefano also arbitrarily failed to show up for meetings with Plaintiff.   For example, on March 8, 2016, Plaintiff showed up prepared for their weekly meeting at 11:00 a.m. Di Stefano did not show up, however, and later sent an e-mail moving the meeting to another day. On March 11, 2016, Di Stefano asked to meet with Plaintiff, and agreed that they would meet before Di Stefano's planned departure at 5:30 p.m.   When Plaintiff showed up at 5:05 p.m., however, Di Stefano had already left for the day.   On March 14, 2016, Di Stefano failed to show up for an 8:00 a.m. meeting that she had scheduled and instead sent Plaintiff an e-mail asking her to move items out of the legal department's conference room.

68.     Di Stefano's hostile and arbitrary conduct continued.   On March 15, 2016, Plaintiff was continuing to work on litigation evaluations that needed to be provided to Haelen the following day.   Di Stefano cancelled a meeting with Plaintiff that morning.   After Plaintiff later e-mailed Di Stefano a draft of the litigation evaluation, Di Stefano came into the conference in which Plaintiff was working with her arms stretched out and said that she felt "dissed" that Plaintiff had e-mailed her the document rather than printing it for her.

69.     In a meeting on March 16, 2015, Di Stefano further criticized Plaintiff for her requested time off.   Di Stefano once again made remarks directed at Plaintiff's desire to spend a modest amount of time with her daughters.   Di Stefano also said, among other things, in substance that:

(i)     at her prior agency, she had had to make a choice between working at the agency or being able to work from home with her daughter, and that she had opted to leave the agency;

(ii)    she works seventy-five hours a week and was working nights and weekends.

70.     When Plaintiff asked how she was expected to handle her own workload and whether she was expected to work nights and weekends, Di Stefano abruptly said that she expected Plaintiff to figure out a way to get the work done and to use triage.

71.     Later that day, Plaintiff asked Di Stefano whether she could work from home in the evening after her daughters went to bed, as she was the only parent home that night.  Di Stefano responded that Plaintiff could work at home, but that she could not use the time to replace time that she had been out of the office that day unless she did her work in the office.  This was contrary to the practice permitted by the prior Fund Counsel and, upon information and belief, as afforded to other Fund employees.

72.     By this point, Plaintiff's mental state was deteriorating.  The denial of her request to return to an 80% work schedule, the denial of credit or compensation for the many excessive hours that she had worked, and the on-going arbitrary changes of course as to her attempts to arrange a few hours per week to be with her daughters was taking a toll.  Moreover, the comments directed at her were extremely humiliating.  On top of all of this, the arbitrary cancelling of meetings, changes in work assignments and criticism of her work stood in stark contrast to the extremely positive reviews that she had been receiving just months prior and to her long-standing performance at the Fund.

73.     Indeed, the humiliating comments directed at Plaintiff's desire to care for her daughters stood in stark contrast to the Fund's prior willingness to allow Plaintiff to work a reduced workload.

**E.      Plaintiff's Complaint and Defendants' Retaliatory Actions**

74.     On March 17, 2016, Plaintiff met with Haelen.  She summarized the actions directed against her, as set forth above, and protested the demeaning treatment toward her.  Plaintiff specifically described her March 1, 2016 meeting with Di Stefano (discussed above).  Haelen indicated that he had been aware of the March 1 meeting and Plaintiff's interactions with Di Stefano generally.

75.     Haelen proceeded, however, to reinforce the very conduct of which Plaintiff was complaining and to further humiliate her.  He stated, among other things, in substance that

> (i)     he had sacrificed so much parenting for work;
>
> (ii)    for Plaintiff to get emotional in a meeting with Di Stefano about work-parenting issues was immature and unprofessional; and
>
> (iii)   Plaintiff had a problem with work and parenting balance for a very long time.

76.     When Plaintiff directly raised the issue of bullying by DiStefano, Haelen said that there were performance issues with Plaintiff's work and that she needed to self-reflect and be more efficient.  Plaintiff did not understand why Haelen, who had previously praised Plaintiff's work, was now parroting Di Stefano's complaints.

77.     When Plaintiff asked Haelen whether she would like him to provide a written summary of what she had expressed to him, he said that she could file a complaint with Lais, but

attempted to dissuade her.  He said that if she filed a complaint, he would be obligated to act on it, that they would have to have meetings and that it would be "painful."  Moreover, despite the sensitive nature of Plaintiff's complaint, Haelen said at the conclusion of the March 17, 2016 meeting that he was obligated to share the substance of the meeting with Di Stefano.

78.     The meeting with Haelen left Plaintiff further humiliated and fearful as to the repercussions of her filing a complaint.  Nonetheless, Plaintiff decided to proceed, and on March 18, 2016, she made a verbal complaint to Lais via voicemail.  Referencing the hostile conduct and the Fund's Anti-Bullying Policy, Plaintiff summarized the conduct to which Di Stefano had subjected her and asked that Lais investigate it.

79.     Lais responded to Plaintiff by e-mail that day, acknowledging the receipt of the complaint and suggesting a meeting to discuss it.

80.     Remarkably, in the very e-mail acknowledging the receipt of Plaintiff's complaint, Lais advised Plaintiff that there were performance issues with her work that Haelen and Lais intended to address with a performance improvement plan ("PIP").  This was the first time that Plaintiff learned that Haelen and Lais had been discussing concerns with Plaintiff's performance.  Plaintiff, in her entire tenure at the Fund, had never been subjected to a PIP.  Plaintiff perceived the response as threatening and retaliatory for her proceeding with the complaint, over Haelen's admonitions.

81.     The retaliatory response to Plaintiff's complaint continued.  On March 21, 2016, the next business day following Plaintiff's making her complaint to Lais, Di Stefano (upon information and belief, at the prompting of, or with the approval of, Haelen) directed Plaintiff that

communications with Fund staff would need to go through Di Stefano.  This was completely contrary to Plaintiff's functioning throughout her tenure.  She had always had the ability to contact Fund staff directly with questions, to respond to inquiries, or the like.  Such access was essential to Plaintiff's carrying out her duties as Associate Counsel.  Plaintiff was provided no explanation for the arbitrary and unprecedented directive to communicate through Di Stefano.

82.     Lais eventually met with Plaintiff in person on or about March 30, 2016.  This was the only meeting that Lais or anyone else had with Plaintiff to discuss her complaint.  At the outset, Lais raised the PIP, but said that it would not be addressed until the complaint was resolved.

83.     In the March 30, 2016 meeting, Plaintiff provided Lais a detailed written chronology of her interactions in the preceding months.

84.     Plaintiff assumed that Lais would proceed with the investigation, given the Fund's policy of "promptly and diligently" investigating complaints, but it dragged its feet in responding to the Complaint.  In reality, as set forth below, Lais (upon information and belief, at the direction of Haelen), delayed in undertaking a prompt investigation.

85.     In addition, Haelen and Lais failed to take even temporary remedial steps while Plaintiff's complaint was pending.

86.     Defendants also isolated Plaintiff, taking unprecedented steps against her.  In particular, Di Stefano (upon information and belief, at the prompting of, or with the approval of, Haelen) removed Plaintiff from invitations for meetings in which she had historically participated throughout her tenure at the Fund and in which her participation was germane to her duties as

Associate Counsel.   Plaintiff was provided no explanation for being taken off of meeting invitations.

87.     Di Stefano also removed Plaintiff from regular legal department meetings.

88.     In addition to these actions, Plaintiff was further isolated.  From March 18, 2016 through June 2016, Di Stefano (upon information and belief, at the prompting of, or with the approval of, Haelen) excluded Plaintiff from meetings on litigation matters with (i) outside counsel; and (ii) the Attorney General's Office.  Plaintiff was provided no explanation for being excluded from such meetings.

89.     The exclusion from meetings was humiliating for Plaintiff, made her feel singled out and also impaired her ability to perform her work functions.

90.      Plaintiff also had work assignments taken from her.  From March 18, 2016 through June 2016, Di Stefano (upon information and belief, at the prompting of, or with the approval of, Haelen) told Plaintiff to give her numerous files on matters for which Plaintiff had been responsible.  Plaintiff was provided no explanation for the files being taken from her.

91.     Upon information and belief, including, but not limited to, Haelen's statements referenced above, Di Stefano and Haelen communicated openly about Plaintiff's complaint, and Haelen directed or approved the retaliatory actions against Plaintiff.

92.     From April 2016 through June 2016, Di Stefano isolated Plaintiff further by failing to respond to multiple requests by Plaintiff to be out of the office to attend personal appointments, take vacation, and to attend a continuing legal education program.

93.     From the time that she made her complaint to Lais, Plaintiff from time-to-time inquired about the status of the investigation and informed Lais about the negative impact of Defendants' conduct upon her physical and mental health.   Lais provided Plaintiff repeated assurances that the results would soon be provided, only to later provide excuses for further delay and more empty promises.

94.     Pursuant to the Fund's policy, Plaintiff was to receive "a written response . . . following the conclusion of [the] investigation . . . ." of her complaint.   By May 27, 2016, after seventy days had passed since Plaintiff's initial verbal complaint to Lais, she had still failed to receive any written response from the Fund.  Indeed, she had not even been advised of a date upon which she could expect to receive it.

95.     Given the continued hostile environment and retaliatory acts and the deepening toll that it was taking upon Plaintiff, she specifically advised the Fund by e-mail on May 27, 2016 that the delay in the investigation of her complaint "is impacting work and I am feeling worse."   In her e-mail response dated June 2, 2016, Lais responded, "I will be conducting meetings next week as part of the investigation.  Being a short week and as Bob and Jo Anne have been busy I was unable to set this up."

96.     Remarkably, even on notice of this continuing harm, the Fund continued its conduct.

97.     On or about June 1, 2016, Plaintiff requested from Di Stefano approval for a vacation later that month.  Di Stefano said that she would have to check with Haelen.  By June 15, 2016, Di Stefano still had not responded to Plaintiff's vacation request.

22

98.     In the meantime, Plaintiff was advised by her physician to take medical leave from work at the Fund, in light of Plaintiff's compromised health condition.  Thereafter, as set forth below, Plaintiff so informed Defendants and did take such leave.

99.     Plaintiff also, through letter of counsel sent on or about June 27, 2016, protested the lack of a response to her complaint.  Even then, the Fund did not provide any report of the investigation of Plaintiff's complaint.

100.    The Fund thereafter communicated to Plaintiff through counsel and, in November 2016, provided finally provided what purported to be a copy of a summary of the report of the investigation of Plaintiff's complaint (without the attachments).

101.    The putative report summary, dated June 20, 2016 and sent from Lais to Haelen and his deputy, reflected, among other things, the lack of timely investigation.

102.    The report summary revealed that Lais had taken no action for months.  The summary reflects that the only interviews conducted were of a legal analyst and administrative assistant on June 13, 2016, and of Di Stefano on June 17, 2016.  The report summary does not identify any review of e-mails or other documentation.

103.    Notably, while concluding that there was "not sufficient evidence" of bullying, Lais did acknowledge a "lack of communication and cooperation" and "a dysfunctional work environment" and recommended "mediation, counseling or changing work arrangements" as possible resolutions to Plaintiff's complaint.

104.    Defendants, however, have failed to implement any remedial actions, even the limited measures recommended by Lais.

F.      **Plaintiff's Damages**

105.    Defendants' conduct set forth herein directly and proximately caused Plaintiff to suffer damages, including, but not limited to, the following:

106.    Beginning in or around June 2016, Plaintiff was forced to go on medical leave because of the mental anguish that Defendants' conduct created.  In addition to her own repeated warnings about the negative impact that Defendants' conduct was having on her mental health, Plaintiff duly provided Defendants with a note from her physician confirming her need to take medical leave.  Plaintiff has since had to extend her medical leave for successive periods, in each instance providing Defendants with a note from her physician to that effect.

107.    As a result, Plaintiff was forced to exhaust her accumulated vacation time and sick time.  She thereafter drew down on accumulated 'sick bank' time and a substantially reduced rate of compensation, thereby suffering lost wages.  Plaintiff now faces the imminent loss of even her reduced 'sick bank' compensation and a complete loss of benefits, along with lost future wages.

108.    In addition, Plaintiff has been denied credit that she should have been afforded, pursuant to the 1999 Resolution, for her excessive hours that she worked.

109.    Plaintiff also faces the loss of accrual of credits toward her Tier IV pension through the New York State Retirement System.

110.    Plaintiff has also suffered as a result of the humiliating, threatening and retaliatory conduct directed at her.  She has suffered, among other things, great mental distress.

**AS AND FOR A FIRST CAUSE OF ACTION**
(State University Construction Fund – Gender Discrimination – Title VII)

111.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

112.    Defendant Fund engaged in discrimination in the terms and conditions of employment on account of Plaintiff's gender by, among other things, subjecting Plaintiff to a hostile work environment, in violation of Title VII.

113.    Defendant Fund's conduct has directly and proximately caused Plaintiff to suffer the damages set forth herein.

**AS AND FOR A SECOND CAUSE OF ACTION**
(State University Construction Fund – Title VII Retaliation)

114.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

115.    Defendant Fund retaliated against Plaintiff for engaging in protected activity, in violation of Title VII.

116.    Defendant Fund's conduct has directly and proximately caused Plaintiff to suffer the damages set forth herein.

**AS AND FOR A THIRD CAUSE OF ACTION**
(Haelen and Di Stefano – Section 1983, Equal Protection)

117.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

118.    Defendants Haelen and Di Stefano were at all times acting under color of state law.

119.    Defendants Haelen and Di Stefano intentionally and with malice and reckless indifference, and without any good faith basis in law, deprived Plaintiff of her rights to Equal Protection under the Fourteenth Amendment to the Constitution of the United States by discriminating against her on account of her gender and family status.

120.    Defendant Haelen intentionally and with malice and reckless indifference, and without any good faith basis in law, failed to supervise or train Di Stefano with respect to the conduct giving rise to the violations of Plaintiff's rights as alleged herein.

121.    Defendant Haelen's and Di Stefano's conduct has directly and proximately caused Plaintiff to suffer the damages set forth herein.

**AS AND FOR A FOURTH CAUSE OF ACTION**
(Haelen and Di Stefano – Section 1983, First Amendment Retaliation)

122.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

123.    Plaintiff engaged in speech protected by the First Amendment by, among other things, reporting to Haelen and Lais (i) the Fund's non-compliance with the 1999 Resolution; (ii) the conduct directed at her by Di Stefano; (iii) the violations of the Fund's anti-bullying policy; and (iv) the Fund's non-compliance with its own procedures, all being matters of public concern.

124.    Defendants Haelen and Di Stefano intentionally and with malice and reckless indifference, and without any good faith basis in law, retaliated against Plaintiff for her exercise of her First Amendment rights.

26

125.    Defendant Haelen intentionally and with malice and reckless indifference, and without any good faith basis in law, failed to supervise or train Di Stefano with respect to the conduct giving rise to the violations of Plaintiff's rights as alleged herein.

126.    Defendant Haelen's and Di Stefano's conduct has directly and proximately caused Plaintiff to suffer the damages set forth herein.

## AS AND FOR A FIFTH CAUSE OF ACTION
(Haelen and Di Stefano - Section 1983, Substantive Due Process)

127.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

128.    Plaintiff held a property interest, pursuant to the 1999 Resolution, in credit for her excessive time.

129.    Defendants Haelen and Di Stefano intentionally and with malice and reckless indifference, and without any good faith basis in law, and by arbitrary and capricious actions, deprived Plaintiff of her Substantive Due Process rights under the Fourteenth Amendment to the United States Constitution to the compensation pursuant to the 1999 Resolution.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Haelen and Di Stefano – Discrimination - NYSHRL)

130.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

131.    Defendants Haelen and Di Stefano engaged in discrimination in the terms and conditions of employment on account of Plaintiff's gender and family status by, among other things, subjecting Plaintiff to a hostile work environment, in violation of the NYSHRL.

132.    Defendant Haelen's and Di Stefano's conduct has directly and proximately caused Plaintiff to suffer the damages set forth herein.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
(Haelen and Di Stefano– Retaliation - NYSHRL)

133.    The allegations set forth in the preceding paragraphs above are re-alleged incorporated herein.

134.    Defendants Haelen and Di Stefano retaliated against Plaintiff for engaging in protected activity, in violation of the NYSHRL.

135.    Defendant Haelen's and Di Stefano's conduct has directly and proximately caused Plaintiff to suffer the damages set forth herein.

WHEREFORE, Plaintiff seeks a judgment:

a.    granting judgment on each cause of action against each Defendant as alleged herein;

b.    declaring that Defendants engaged in the discriminatory, retaliatory and otherwise unlawful conduct as alleged herein;

c.    permanently enjoining Defendants from engaging in any of the illegal practices set forth herein, and directing Defendants to take all affirmative steps to ensure that such practices are eliminated;

d.    restoring Plaintiff to the position in which she would have been but for Defendants' illegal practices, including, but not limited to, awarding Plaintiff back pay, front pay, restoration of and or / compensation for lost vacation, sick and any other accrued time, health and other benefits (including, but not limited to, all costs incurred on account of any lapse or denial of benefits), lost pension credits and excessive hours worked;

28

e.      awarding Plaintiff compensatory damages for all harm, including, but not limited to, physical harm, emotional distress, humiliation and reputational harm;

f.      awarding Plaintiff pre-judgment and post-judgment interest;

g.      awarding Plaintiff attorneys' fees, costs and disbursements; and

h.      awarding Plaintiff such other and further relief as the Court may determine to be just and proper.

Dated: Albany, New York
        August 16, 2017

TABNER, RYAN & KENIRY, LLP

  s/Thomas R. Fallati
Thomas R. Fallati
Bar No. 515267
*Attorney for Plaintiff Terese Meagher*
18 Corporate Woods Blvd.
Albany, NY 12211
Telephone: (518) 512-5307
Facsimile: (518) 465-5112
trf@trklaw.com