UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TERESE MEAGHER,

                                Plaintiff,

        - against -

STATE UNIVERSITY CONSTRUCTION FUND,               Civil Action No.:
ROBERT HAELEN,                                    1:17-CV-903 (GTS / CFH)
        in his official and individual capacity, and
JOANNE DI STEFANO,
        in her official and individual capacity,


                        Defendants.
_____


**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**


Thomas R. Fallati, Esq.
Bar No. 515267
*Counsel for Plaintiff*
TABNER, RYAN & KENIRY, LLP
18 Corporate Woods Blvd.
Albany, New York 12211
Telephone: (518) 512-5307
Facsimile: (518) 465-5112
trf@trklaw.com

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 5

   I.     PLAINTIFF PLEADS VALID GENDER DISCRIMINATION CLAIMS ................... 5

     A.   The Complaint Sufficiently Alleges Discriminatory Intent ............................. 5

     B.   The Complaint Sufficiently Alleges a Hostile Environment ......................... 15

   II.    PLAINTIFF PLEADS VALID RETALIATION CLAIMS ......................................... 17

   III.   PLAINTIFF PLEADS A VALID EQUAL PROTECTION CLAIM ........................... 20

   IV.   PLAINTIFF PLEADS A VALID FIRST AMENDMENT RETALIATION CLAIM...20

   V.    PLAINTIFF PLEADS A VALID DUE PROCESS CLAIM ........................................ 22

   VI.   PLAINTIFF PLEADS VALID NEW YORK STATE HUMAN RIGHTS CLAIMS .. 24

CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Adams v. N.Y. State Educ. Dep't</u>, 2010 U.S. Dist. LEXIS 15635 (S.D.N.Y. Feb. 23, 2010) ..... 21

<u>Alfano v. Costello</u>, 294 F.3d 365 (2d Cir. 2002) ......................................................... 14

<u>Back v. Hastings on Hudson Union Free Sch. Dist.</u>, 365 F.3d 107 (2d Cir. 2004) . 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 20

<u>Bader v. Special Metals Corp.</u>, 985 F. Supp. 2d 291 (N.D.N.Y. 2013)............................ 17, 18, 19

<u>Bailey v. NYSDHR</u>, 38 Misc. 3d 756 (Sup. Ct. N.Y. County 2012) ........................... 10

<u>Brumell v. Webster Cent. Sch. Dist.</u>, 2009 U.S. Dist. LEXIS 7644 (W.D.N.Y. Jan. 29, 2009) .. 19

<u>Bunda v. Potter</u>, 369 F. Supp. 2d 1039 (N.D. Iowa 2005)............................................. 17

<u>Burns v. Cook</u>, 458 F. Supp. 2d 29 (N.D.N.Y. 2006).................................................... 23

<u>Chadwick v. WellPoint, Inc.</u>, 561 F.3d 38 (1St Cir. 2009)................................... 9, 10, 15

<u>Cherry v. NYC Hous. Auth.</u>, 2017 U.S. Dist. LEXIS 161830 (E.D.N.Y. Sept. 29, 2017)....... 5, 17

<u>Christiansen v. Omnicom Grp., Inc.</u>, 852 F.3d 195 (2d Cir. 2017) ................................. 6

<u>Cohn v. New Paltz Cent. Sch. Dist.</u>, 363 F. Supp. 2d 421 (N.D.N.Y. 2005) .............................. 24

<u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560 (2d Cir. 2000) ............................................. 16

<u>DeMartino v. N.Y. State Dep't of Labor</u>, 167 F. Supp. 3d 342 (E.D.N.Y. 2016) ........................ 23

<u>Dillon v. Boyce</u>, 1995 U.S. Dist. LEXIS 21449 (E.D.N.Y. Mar. 14, 1995)................................ 23

<u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55 (2d Cir. 1998) ......................................... 18

<u>Grant v. N.Y.S. Office for People with Developmental Disabilities</u>, 2013 U.S. Dist. LEXIS 107565 (E.D.N.Y. July 30, 2013) ........................................................ 19

<u>Harris v. Forklift Systems</u>, 510 U.S. 17 (1993) ......................................................... 16

<u>Henry v. Wyeth Pharms., Inc.</u>, 616 F.3d 134 (2d Cir. 2010)......................................... 18

ii

Klings v. NYS Office of Court Admin., 2010 U.S. Dist. LEXIS 33434 (E.D.N.Y. April 5, 2010) .................................................................................................................................. 13

McDonnell Douglas ......................................................................................................... 17

N.Y.S. Law Officers Union v. Andreucci, 433 F.3d 320 (2d Cir. 2006) ................ 20, 21

Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721 (2003) ........................................ 8, 9

O'Connor v. Pierson, 426 F.3d 187 (2d Cir. 2005) ............................................... 22, 23

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ...................................................... 8

Rathbone v. CVS Pharm., Inc., 2006 U.S. Dist. LEXIS 30216 (D. Conn. May 12, 2006) .......... 12

Richardson v. NYS Dep't of Correctional Serv., 180 F.3d 426 (2d Cir. 1999) ..................... 16, 17

Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46 (1st Cir. 2000), .................. 9, 12

Sheehan v. Donlen Corp., 173 F. 3d 1039 (7th Cir. 1999) ....................................... 9, 10

Soundview Assocs. v. Town of Riverhead, 725 F. Supp. 2d 320 (E.D.N.Y. 2010) ................... 24

Sumner v. U.S. Postal Serv., 899 F.2d 203 (2d Cir. 1990) ........................................... 17

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003) ............................................... 14, 16, 17

Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997) ............................................................. 16

Towers v. State Univ. of N.Y., 2007 U.S. Dist. LEXIS 37373 (E.D.N.Y. May 23, 2007) . 5, 6, 11, 15

Trezza v. Hartford, Inc., 1998 U.S. Dist. LEXIS 20206 (S.D.N.Y. Dec. 30, 1998) ................ 6

Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72 (2d Cir. 2015) ......................... 5

Wallace v. Suffolk County Police, Dep't, 2007 U.S. Dist. LEXIS 98745 (E.D.N.Y. Feb. 5, 2007) .................................................................................................................................. 21, 22

Weinstock v. Columbia Univ., 224 F.3d 33 (2d Cir. 2000) ........................................... 8

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62 (2d Cir. 2000) ............... 16, 17

iii

Zaengle v. Rosemount, Inc., 2013 U.S. Dist. LEXIS 70211 (E.D. Pa. May 17, 2013) ............... 12

Zamot v. Monroe Cty. Dep't of Human Servs., 739 F. Supp. 311 (W.D.N.Y. 2010) ................. 14

**Statutes**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 1

New York Human Rights Law § 292.26 ..................................................................... 24

New York State Human Rights Law ..................................................................... 4, 24

**Other Authorities**

EEOC, Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving

    Responsibilities, at I.B, available at www.eeoc.gov/policy/docs/caregiving.html) ................... 9

Plaintiff Terese Meagher submits this memorandum of law in opposition to the motion of Defendants State University of New York Construction Fund ("Fund"), Robert Haelen and Joanne Di Stefano to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Meagher is an attorney who began working at the Fund in 2009 as Associate Counsel. For the next six years, from June 2009 through the summer of 2015, she received positive reviews and merit bonuses. (Complaint ¶¶ 13, 19-28.) In August 2015, Haelen, the General Manager of the Fund, informed Meagher that Di Stefano would be taking over as Meagher's supervisor (to fill the vacancy created by the retirement of the Fund's Counsel). At the time, Meagher had outstanding requests with regard to her work schedule and spending additional time with her two young daughters. Contrary to what Defendants suggest in their motion, however, this is not a case about accommodations.

Rather, as set out in detail in the Complaint, the case is about the hostile environment to which Meagher was subjected by Di Stefano and Haelen. As detailed in the Complaint, within a matter of months, Meagher, an attorney who had performed ably for so many years, suddenly saw her commitment to work at the Fund questioned, was subjected to on-going humiliating comments, constant criticism, arbitrary actions, and ultimately was pushed to the point of tears; adding to the humiliation, she was then criticized for getting emotional and, after she filed a complaint, was ostracized and isolated and ultimately pushed to the point of having to take physician-directed sick leave.

In the face of these allegations, Defendants take a 'see no evil' approach, suggesting that the litany of specific factual allegations does not allege discrimination based upon gender. Notwithstanding Defendants' repeated protests, the Complaint is replete with express statements

and supporting circumstances making crystal clear that the hostile environment was motivated by Meagher's being a woman with young children.  In fact, the Complaint sets out a hostile environment claim under Title VII upon well-settled case law recognizing "gender plus" (here, gender plus having young children) as giving rise to Title VII liability.

Beginning in the summer of 2015, when Di Stefano was hired as Meagher's supervisor, Meagher had already asked Haelen (i) to return to an 80% work schedule, as she had originally worked for years, and (ii) that the Fund comply with a 1999 resolution of the Fund's Board of Trustees providing for compensation for excess hours worked ("1999 Resolution").  (Complaint ¶¶ 29-37.)   Meagher was working beyond her normal work week (see, e.g., Complaint ¶¶ 37, 42), without the additional compensation or time off mandated by the 1999 Resolution. (Complaint ¶ 31.)  Although Di Stefano acknowledged the great work burden on Meagher, she informed Meagher that the Fund would not agree to her requests. (Complaint ¶ 40.)  Meagher ultimately requested just two hours off each week (Complaint ¶ 43), based on her calculation that she could take such time and still meet her full-time work demands.  (Complaint ¶ 42.)  Di Stefano initially approved the request, but then denied having done so and, in the following weeks, engaged in arbitrary and belittling behavior to Meagher in response to her modest request for time off.  (See, e.g, Complaint ¶¶ 49, 53, 55, 62,, 64, 65, 71.)

Most telling, Di Stefano also engaged in a campaign of verbal abuse (reinforced by Haelen), all tied to Meagher's being a mother with young children, stating, among other things, that when she was raising her daughter, she had taken a lower paying job in a state agency to have more time to spend with her daughters (Complaint ¶ 56); "wouldn't it be nice if we could go home and eat dinner with our families" (Complaint ¶ 56); "when she had had to make a choice between working at the agency or being able to work from home with her daughter, . . .

2

she opted to leave the agency" (Complaint ¶ 69); and that she works every night and weekend to what is likely the destruction of her personal life.  (Complaint ¶¶ 56, 69.)  She persistently conveyed that Meagher was, as a mother with young children, not committed to her work, questions particularly ironic given that Di Stefano was just months into her position and it was Meagher who had worked there for years and had moved to full-time at the request of management.  Di Stefano at various times asked in a hostile manner whether Meagher still wanted to work at the Fund (Complaint ¶ 49), and stated that Meagher "needed to demonstrate that the legal department's work would be done." (Complaint ¶ 62.)  Haelen reinforced the comments, stating that he had "sacrificed so much parenting for work" and that Meagher "had a problem with work and parenting balance for a very long time."  (Complaint ¶ 75.)

Di Stefano's hostility was further manifested in other conduct that, although not explicitly tied to Meagher's being a mother, reinforced and deepened the humiliation.  Among other things, when she prompted Meagher to begin to cry in a meeting, she put both hands on the table and leaned over to Meagher demanding, "Look at me. . . . I want to see if you are listening to me." (Complaint ¶ 63.)  She barraged Meagher with a series of criticisms about her work, all of which were subjective in nature.  She professed to being "personally and professionally offended," "embarrassed," and "dissed" (see, e.g., Complaint ¶¶ 49, 58, 68) by an employee who previously had six years of positive reviews under her prior supervisor.  She criticized Meagher's work reports, but refused to provide an explanation for the problem or to provide any guidance as to what she expected to see.  (Complaint ¶¶ 49, 51.)

When Meagher met with Haelen about Di Stefano's conduct, he exacerbated it, criticizing Meagher as "unprofessional" for crying in the meeting with Di Stefano, demeaning

Meagher in similar terms to Di Stefano with regard to work and family, and then attempting to dissuade Meagher from filing a complaint against Di Stefano.  (Complaint ¶¶ 75-76.)

Tellingly, Healen's admonition against Meagher's filing a complaint came to fruition. After Meagher filed a complaint with Mary Jo Lais, the human resources director, she was cut out of meetings and from contact with staff and impeded in the performance of her work. (Complaint ¶¶ 80-97.)  As weeks dragged on with no response, her health worsened, and she ultimately took medical leave.   (Complaint ¶¶ 105-10.)  Lais' report dated June 20, 2016, more than three months after Meagher's initial complaint, was not provided to Meagher at the time. (Complaint ¶ 102.)  Far from dismissing Meagher's complaints out-of-hand, and accounting for the fact that she was reporting about the Fund's chief legal officer (whom Haelen had appointed just months earlier), her measured conclusions are notable.  (See Complaint ¶ 103.)

In light of all of this, Defendants' suggestion that the Complaint only pleads a dispute over an accommodation is simply preposterous.  As to the Title VII discrimination claim, the Complaint more than readily satisfies the minimal burden for pleading discriminatory intent based on Meagher's status as a woman with young children.  As to the Title VII retaliation claim, Defendants only attack the pleading of the element of Defendants' knowledge that Meagher's internal complaints were based upon gender.  Her detailed complaints, replete with specific references to her parenting and the issue of work-family balance, plainly set out a claim for "gender plus" discrimination.  Defendants' identical challenges to the Equal Protection and New York State Human Rights Law ("NYSHRL") claims fail for the same reasons.

With regard to the remaining claims, Defendants likewise offer no basis for dismissal. Meagher's complaints addressed not simply her own circumstances, but more broadly the Fund's compliance with the 1999 Resolution and its own policies and therefore constituted speech of a

4

"public concern" supporting the First Amendment retaliation claim. Moreover, the Complaint plausibly pleads that the refusal to comply with the 1999 Resolution was arbitrary and motivated by animus toward Meagher, and therefore pleads a valid Substantive Due Process claim.

## ARGUMENT

## I.   PLAINTIFF PLEADS VALID GENDER DISCRIMINATION CLAIMS

In pleading a claim for Title VII discrimination (First Cause of Action), a plaintiff bears a "minimal" burden and "need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86-87 (2d Cir. 2015) (citation omitted); see also Cherry v. NYC Hous. Auth., 2017 U.S. Dist. LEXIS 161830, at **42-43 (E.D.N.Y. Sept. 29, 2017). The Complaint provides far more than "minimal support for the proposition" that Defendants discriminated against Meagher on the basis of her being a female with young children.

### A.   The Complaint Sufficiently Alleges Discriminatory Intent

"Gender plus" or "sex plus" describes "'a policy or practice by which an employer classifies employees on the basis of sex plus another characteristic.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 118 n. 7 (2d Cir. 2004) (citation omitted). The Second Circuit has noted that "the 'plus' does not mean that more than simple discrimination must be alleged; rather, it describes the case where 'not all members of a disfavored class are discriminated against.'" Id. at 118 n. 7 (citation omitted). While preferring to use the term "gender stereotype," the court nonetheless has made clear that discrimination on the basis of one's being a woman plus a mother of young children is actionable as gender discrimination. Id. at 119; see also Towers v. State Univ. of N.Y., 2007 U.S. Dist. LEXIS 37373, at *3 (E.D.N.Y. May 23, 2007) (denying motion to dismiss hostile environment claims where, among other

things, plaintiff alleged that she was denied maternity leave); Trezza v. Hartford, Inc., 1998 U.S. Dist. LEXIS 20206, at **19-21 (S.D.N.Y. Dec. 30, 1998) (denying motion to dismiss Title VII claim based upon "sex plus" theory, where plaintiff alleged that she was discriminated against as a woman with children).

Moreover, while Back arose in the context of an adverse employment action case, the gender-plus / gender stereotype theory is plainly applicable to a hostile work environment claim. Indeed, in Christiansen v. Omnicom Grp., Inc., 852 F.3d 195 (2d Cir. 2017), the Second Circuit upheld a hostile work environment claim based on same-sex gender stereotyping. Id. at 200-01; see also Towers, 2007 U.S. Dist. LEXIS 37373, at **3-7 (denying motion to dismiss hostile environment claim based upon "gender plus" theory). Summarizing the law, the EEOC has stated unambiguously that "[t]he same legal standards that apply to other forms of harassment prohibited by the EEO statutes also apply to unlawful harassment directed at caregivers . . . ." EEOC Guidance at II.F.

Back illustrates the legal bases for finding discrimination against women with children.[1] Back was hired by the defendant school as a psychologist on a three-year tenure track.  Id. at 113.  Significantly, her supervisors, the school principal and director of pupil personnel services, were female.  For the first two years of Back's employment, they "consistently gave her excellent evaluations."  Id. at 114.  After Back returned from maternity leave in her second year, she initially received continued positive evaluations and assurances that she would receive tenure, id. at 114-15, but Back alleged that "things changed dramatically as her tenure review approached."  Id. at 115.

---

[1] Back arose under Section 1983, which, Defendants acknowledge (Def. Mem. at 14), applies identical principles to Title VII for these purposes.

Over the succeeding months, her two female supervisors made a number of comments relating to her ability to perform the work given her caregiving responsibilities in ways strikingly similar to those here:

> A few days later, on January 8, 2001, Brennan allegedly told Back for the first time that she might not support Back's tenure because of what Back characterizes as minor errors that she made in a report. According to Back, shortly thereafter, Principal Wishnie accused her of working only from 8:15 a.m. to 3:15 p.m. and never working during lunch.   When Back disputed this, Wishnie supposedly responded that "'this was not [Wishnie's] impression and . . . that she did not know how she could perform the job with little ones.  She told me that she worked from 7 a.m. to 7 p.m. and that she expected the same from me.  If my family was my priority, she stated, maybe this was not the job for me."

Id. at 115.  Among other things, Back was told "that she was expected to work until 4:30 p.m. every day, and was asked 'What's the big deal? You have a nanny.  This is what you [have] to do to get tenure[]'" and that her supervisors "were 'concerned that, if [Back] received tenure, [she] would work only until 3:15 p.m. and did not know how [she] could possibly do this job with children.'"   Id. at 115.   They` expressly questioned Back's commitment to work given her childcare responsibilities and whether Back's "apparent commitment to [her] job was an act." Id.  According to Back, "[t]hey stated that once I obtained tenure, I would not show the same level of commitment I had shown because I had little ones at home."  Id.  After Back expressed concerns through counsel, the supervisors responded with a memo raising putative concerns about Back's performance and stating that they could not recommend her for tenure.   Id. Ultimately, she was denied tenure.  Id. at 116-17.

Reversing the District Court's grant of summary judgment in the defendants' favor, the Second Circuit held that Back had presented sufficient evidence to proceed to trial on the ground that the defendants had discriminated against her as woman with young children.   The court

7

made clear that Back readily set out a claim for discrimination based upon gender plus her being a mother of young children under the "gender plus" id. at 118 n. 7, or, as the court preferred, "gender stereotyping" theory.  See id. at 118 n.8.

      In so holding, the court cited the Supreme Court's decision in Price Waterhouse v. Hopkins, 490 U.S. 228, 235-36 (1989):

> Just as "it takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course in charm school," Price Waterhouse, 490 U.S. at 256, so it takes no special training to discern stereotyping in the view that a woman cannot "be a good mother" and have a job that requires long hours, or in the statement that a mother who received tenure "would not show the same level of commitment [she] had shown because [she] had little ones at home.'"  These are not the kind of "innocuous words" that we have previously held to be insufficient, as a matter of law, to provide evidence of discriminatory intent.

Id. at 120 (citing Weinstock v. Columbia Univ., 224 F.3d 33, 45 (2d Cir. 2000)).[2]  The court also cited then-Chief Justice Rehnquist's language with respect to women with children in Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 736 (2003), a case under the Family Medical Leave Act:

> Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men.  Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave.    These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees.

---

[2] Price Waterhouse arose from Hopkins' claim that she was denied a partnership at the accounting firm because she did not conform to gender stereotypes.  She had been described as "macho" and "masculine" and was told that she "needed a course in charm school" and to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."  490 U.S. at 235.  The Court held that such conduct was evidence of gender discrimination, holding that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . ."  490 U.S. at 251.

<u>Hibbs</u>, 538 U.S. at 736.

As the Second Circuit in <u>Back</u> held, "<u>Hibbs</u> makes pellucidly clear . . . that, at least where stereotypes are considered, the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based." <u>Id.</u> at 121. Noting <u>Hibbs</u>, the EEOC has similarly explained that "[e]mployment decisions based on such stereotypes violate the federal antidiscrimination statutes, even when an employer acts upon such stereotypes unconsciously or reflexively." EEOC, Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving Responsibilities, at I.B, available at <u>www.eeoc.gov/policy/docs/caregiving.html</u>) (citations omitted) ("EEOC Guidance").

Two cases cited by the Second Circuit in <u>Back</u> sustained claims under similar circumstances. In <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 57 (1ˢᵗ Cir. 2000), the court reversed a grant of summary judgment for the defendant employer, in light of the employer's questioning of Santiago-Ramos' ability to handle her work-family balance and statements of concern about the commitment of women with children. In <u>Sheehan v. Donlen Corp.</u>, 173 F. 3d 1039, 1044-45 (7ᵗʰ Cir. 1999), the court affirmed a verdict in favor of an employee told at the time of her firing "that she would be happier at home with her children."

Also particularly relevant is the First Circuit's post-<u>Back</u> decision in <u>Chadwick v. WellPoint, Inc.</u>, 561 F.3d 38 (1ˢᵗ Cir. 2009). Chadwick, who had four young children and was attending school, had worked for WellPoint for several years with excellent reviews. <u>Id.</u> at 41-42. She was denied a promotion, however, in favor of another employee with a lower performance score and was told by her immediate supervisor Miller, a woman, that the reason was "[i]t was just that you're going to school, you have the kids and you just have a lot on your plate right now." <u>Id.</u> at 42. The First Circuit reversed the district court's grant of summary

judgment for WellPoint, holding that Chadwick set out a viable "sex plus" claim, id. at 43, by alleging "that the subclass being discriminated against based on sex is women with children, particularly young women." Id.

Significantly, the First Circuit held that the district court had erred in granting summary judgment because "the decisionmaker [did] not refer explicitly to women, . . . and 'nothing in [the supervisor's words]' . . . showed that the decision was based on 'a stereotype about female caregivers, not about caregivers generally[.]'" Id. at 45-46 (citations omitted). The court rejected "the district court's requirement that Miller's words explicitly indicate that Chadwick's sex was the basis for Miller's assumption about Chadwick's inability to balance work and home[,]" id. at 46, and held that "[a] reasonable jury could infer from Miller's explanation that Chadwick wasn't denied the promotion because of her work performance but because Miller and others assumed that as a woman with four young children, Chadwick would not give her all to the job." Id. at 47; see also Sheehan, 173 F.3d at 1044 ("It would cripple enforcement of the employment discrimination laws to insist that direct evidence take the form of an employer's statement to the effect that 'I'm firing you because you're in a protected group.'").[3]

In light of Back and the other authority discussed above, the Complaint plainly satisfies the minimal burden for pleading that Di Stefano and Haelen acted with discriminatory intent. These include allegations explicitly tied to Meagher's being a mother with young daughters, as well as others that, though not explicit, in context provide further support for the inference. As

---

[3] Also instructive is the court's decision in Bailey v. NYSDHR, 38 Misc. 3d 756 (Sup. Ct. N.Y. County 2012). The plaintiff there claimed discrimination on the ground that she was subjected to adverse action on account of her being a mother of two young children. Id. at 759-60. DHR had found no probable cause on the ground that she was alleging "familial status" discrimination (at that time, not a protected status under New York law). Id. at 761. The court reversed DHR's finding and, citing among other cases Back and Chadwick, held that the plaintiff's "gender plus" allegations set out a valid claim of gender discrimination. Id. at 762-63.

in <u>Back</u>, the Complaint sets out a sudden, discernible turn in the treatment of Meagher.  The hostile conduct began in the summer of 2015, following a positive six-year work period. (Complaint ¶¶ 13, 19-28.)  Di Stefano was hired at a time when Meagher was working excess hours and already had outstanding requests to return to an 80% work schedule and for compensation for excess hours worked (Complaint ¶¶ 29-37), requests that were ultimately denied.  (Complaint ¶ 40.)  <u>See</u> <u>Towers</u>, 2007 U.S. Dist. LEXIS 37373, at **3-7 (sustaining hostile work environment claim where, among other things, plaintiff alleged that she was "denied maternity leave" and "assigned an unmanageable workload").

In marked contrast to the reception that she had enjoyed for years, Meagher was suddenly subjected to harsh and humiliating criticism about her commitment to work and her work-family balance.  As set out above and in greater detail in the Complaint, Di Stefano demanded to know whether Meagher still wanted to work at the Fund (Complaint ¶ 49) and made a series of demeaning comments specifically aimed at Meagher's status as a caregiver, stating repeatedly, among other things, that when she was raising her daughter, she had taken a lower paying job in a state agency to have more time to spend with her daughters; and "wouldn't it be nice if we could go home and eat dinner with our families."  (Complaint ¶¶ 56, 69.)  In fact, she specifically stated to Meagher that at her prior agency, "when she had had to make a choice between working at the agency or being able to work from home with her daughter, . . . she opted to leave the agency."  (Complaint ¶ 69.)

Di Stefano's actions with regard to Meagher's scheduling were likewise hostile, arbitrary and demeaning.  <u>See</u>, <u>e.g.</u>, Complaint ¶ 53 (Di Stefano scheduled meetings on day on which she had approved time off and then denied having approved it); ¶ 55 (Di Stefano denied that she had previously approved the time off on alternating Tuesdays and Thursdays); ¶ 62 (Di Stefano said

11

that the approved time off on alternating Tuesdays and Thursdays was "temporary"); ¶ 64 (Di Stefano told Meagher that she needed to make requests for time off weekly); ¶ 65 (Di Stefano said that Meagher needed to attend the meeting, even though Meagher had requested time off and did not have childcare lined up and then e-mailed staff regarding Meagher's requests); ¶ 71 (Di Stefano reversed practice of prior Fund Counsel and said that time worked at home could not be used to replace time when Meagher was out of the office).

Haelen reinforced Di Stefano's parenting remarks with ones of his own, and he also characterized Meagher as having "had a problem with work and parenting balance for a very long time." (Complaint ¶ 75.) The statements of Di Stefano and Haelen suggesting that as a mother of young children she was not committed to her work, coupled with sudden criticism of her work, support an inference of discrimination. See Santiago-Ramos, 217 F.3d at 55 (holding that supervisor's questioning of "Santiago-Ramos about her ability to balance her current work and parental responsibilities" supported inference that stated job performance reasons for termination were pretextual); Zaengle v. Rosemount, Inc., 2013 U.S. Dist. LEXIS 70211, at *13 (E.D. Pa. May 17, 2013) (noting that supervisor's "comments and references to plaintiff's family / work balance are also evidence that the written warning was not lodged for its stated purpose") (citing Back, 365 F.3d at 122); Rathbone v. CVS Pharm., Inc., 2006 U.S. Dist. LEXIS 30216, at *20 (D. Conn. May 12, 2006) (in pregnancy discrimination action, noting supervisor's "repeated comments about the timing of Rathbone's pregnancy leave" and holding that "[a] jury could reasonably find these comments show hostility toward Rathbone's pregnancy").

Against the backdrop of Meagher's long-standing excellent reviews, it is plausible to infer that Di Stefano's sudden, persistent and subjective criticisms were not indicative of any diminishment of Meagher's performance but were motivated by Meagher's status as a woman

12

with young children.   In <u>Back</u>, the court held that the timing of the "sudden decline in performance evaluations" concurrent with the commencement of "the alleged discriminatory comments" was consistent with pretext, <u>id.</u> at 125, noting that "[e]ven a subtle reversal in evaluations that is consistent with stereotypical views about mothers, therefore (for example, that an employee no longer seems dedicated to her work, or is no longer able to work efficiently or complete her work in a timely fashion) suggests pretext." <u>Id.</u> at 125 n. 16.

That inference is plainly warranted here at the pleading stage, particularly in that the complaints were not from third-parties.  Rather, Di Stefano's criticisms were entirely subjective in nature: that she was "personally and professionally offended" about a work report (Complaint ¶ 49), was "embarrassed" by Meagher's role in meetings (Complaint ¶ 61; <u>see also</u> ¶ 58), felt "dissed" that Meagher had e-mailed, rather than printed, a document (Complaint ¶ 68), all the while refusing to provide Meagher with a template report (Complaint ¶ 49), and then telling Meagher that she wanted verbal reports instead (Complaint ¶ 52) and then changing course again.  (Complaint ¶ 54.)

Similarly Haelen, while initially acknowledging Meagher's unreasonable workload and promising to remedy it (Complaint ¶¶ 30, 33), instead attacked Meagher for "get[ting] emotional in a meeting with Di Stefano about work-parenting issues" and said that her behavior "was immature and unprofessional."  (Complaint ¶ 75.)  His and Di Stefano's comments, particularly in light of Di Stefano's statements toward Meagher and her intimidating "Look at me" (Complaint ¶ 63), all provide further support for an inference of discrimination.  <u>See Klings v. NYS Office of Court Admin.</u>, 2010 U.S. Dist. LEXIS 33434, at *47 (E.D.N.Y. April 5, 2010) (noting that "remarks that are not blatantly sexist" can support a finding of gender bias, such as statements suggesting "that women are too 'thin-skinned' to handle any negative feedback").

Defendants' response to Meagher's complaints provides still further support for an inference of discrimination. Terry v. Ashcroft, 336 F.3d 128, 149 (2d Cir. 2003) (citing retaliatory acts in support of hostile environment claim). She was immediately told that she would be subject to a "performance improvement plan." (Complaint ¶ 80.) After failing for months to follow through on promises to reduce her caseload and instead insisting that off-hours work was required, Defendants now cut her out of meetings, cut off her communications with colleagues, curtailed her caseload and impeded her work. (Complaint ¶¶ 81-97.) Defendants also took months to address Meagher's complaint, despite her expressed concerns about the impact upon her health. (Complaint ¶¶ 93-103.)

The allegations readily raise an inference that Defendants acted with a discriminatory animus based upon Meagher's being a woman with young children, and Defendants offer no basis to find otherwise. Their suggestion that the Complaint must allege express "derogatory comments about women" (Def. Mem. at 6) was expressly rejected in Back and the other cases discussed above. To the contrary, the statements plausibly give rise to a discriminatory animus toward Meagher as a mother with young children.[4]

The fact that Di Stefano is a woman or that Di Stefano and Haelen (Def. Mem. at 6) are parents does not support dismissal. Moreover, as the court explained in Back:

---

[4] Notably, the two cases upon which Defendants base their argument regarding the pleading (Def. Mem. at 5) concerned the record after trial, not the sufficiency of the pleading. See Alfano v. Costello, 294 F.3d 365, 377-78 (2d Cir. 2002); Zamot v. Monroe Cty. Dep't of Human Servs., 739 F. Supp. 311, 321-22 (W.D.N.Y. 2010). Moreover, both involved general "gender-animus" claims, not gender plus allegations. See Alfano, 294 F.3d at 370 (plaintiff claimed hostile treatment as a female); Zamot, 739 F. Supp. 2d at 322 (plaintiff claimed hostile treatment as a male). In any event, Back made clear that a gender plus claim is based precisely upon a scenario "where 'not all members of a disfavored class are discriminated against.'" Back, 365 F.3d at 118 n.7 (citation omitted). As such, the language from Zamot as to "'general hostility to the presence of [persons of the opposite sex] . . . .'" 739 F. Supp. 2d at 321-22 (citation omitted), is inapplicable.

14

> "[i]n determining whether an employee has been discriminated against 'because of such individual's . . . sex,' the courts have consistently emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace.  <u>As a result, discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex</u>."

<u>Id.</u> at 121-22 (citation omitted) (emphasis supplied).  <u>Id.</u>; <u>see also</u> <u>Chadwick</u>, 561 F.3d at 42 n.4 (questioning relevance of fact that woman selected over Chadwick had two children); <u>Towers</u>, 2007 U.S. Dist. LEXIS 37373, at **3-4 ("That Towers' male supervisor may have had a short paternity leave does not, as SUNY[] contends, defeat Towers' claim.") (citing <u>Back</u>).

For all of these reasons, Defendants' attempt to characterize the matter as a dispute over a requested accommodation mis-characterizes the allegations and ignores the principles articulated in <u>Back</u>.  The question is whether the Complaint plausibly alleges that the hostile actions directed at Meagher were motivated by her status as a mother of young children.  <u>Back</u> and the other cases discussed in the context of summary judgment make clear that Meagher has more than plausibly pleaded that Defendants acted with a discriminatory animus based upon Meagher's being a mother with young children.

For all of these reasons, the Complaint readily satisfies the minimal pleading burden with respect to Defendants' discriminatory animus.

### B.    The Complaint Sufficiently Alleges a Hostile Environment

While Defendants focus principally upon the sufficiency of the discrimination-based allegations, they also suggest, with no citation to case law, that the Complaint fails to allege that Defendants "engaged in conduct so pervasively that it gave rise to a hostile work environment." (Def. Mem. at 6.)  To the extent that Defendants are indeed challenging the pleading of the hostile environment itself, the argument utterly lacks any merit.

15

As an initial matter, the standard for a hostile workplace is in the disjunctive, namely, "'whether workplace harassment was severe <u>or</u> pervasive,'" a question that "'depends on the totality of the circumstances.'" <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 69 (2d Cir. 2000) (quoting <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000)) (emphasis supplied). "While a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" <u>Whidbee</u>, 223 F.3d at 70 (quoting <u>Torres v. Pisano</u>, 116 F.3d 625, 632 (2d Cir. 1997) (reversing district court's holding on summary judgment that "Corliss's conduct was not severe or pervasive because it did not render the plaintiffs' jobs 'unendurable' or 'intolerable.' The bar is not set so high . . . .")). A "non-exclusive list" of relevant factors includes "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any resulted." <u>Richardson v. NYS Dep't of Correctional Serv.</u>, 180 F.3d 426, 437 (2d Cir. 1999) (citing <u>Harris v. Forklift Systems</u>, 510 U.S. 17, 23 (1993)). Moreover, the allegations supporting a retaliation claim can also support the hostile environment claim. <u>See</u> <u>Terry</u>, 336 F.3d at 149.

As detailed above, the Complaint alleges each of these considerations: the conduct began in the summer of 2015 and continued through June 2016, it was on-going, included constant, humiliating statements and conduct, interfered with Meagher's ability to conduct her work and caused her psychological harm. Given that "'[t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim[,]'" <u>Whidbee</u>, 223 F.3d

16

at 70 (quoting <u>Richardson</u>, 180 F.3d at 439), and given the need to consider the allegations "'cumulatively,' so that [a court] may obtain a realistic view of the work environment[,]" <u>Richardson</u>, 180 F.3d at 437, the allegations readily set out a hostile work environment. See <u>Terry</u>, 336 F.3d at 149. Indeed, the conduct alleged is more hostile than the conduct found to be sufficient in <u>Cherry</u>, a case that Defendants cite. See <u>Cherry</u>, 2017 U.S. Dist. LEXIS 161830, at *51 ("Bazelias also used her management position to create an atmosphere designed to frustrate Plaintiff's work performance. At the very least, Bazelias' comments were humiliating and 'calculated to interfere' with Plaintiff's work.") (citation omitted).[5]

## II.      PLAINTIFF PLEADS VALID RETALIATION CLAIMS

Defendants challenge the retaliation claim (Second Cause of Action) in only one respect, namely, the Fund's knowledge of Meagher's "protected activity" pursuant to Title VII. See <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 307 (2d Cir. 2015). "An employee engages in protected activity when she complains about or otherwise opposes conduct that she reasonably believes constitutes forbidden discrimination or retaliation." <u>Bader v. Special Metals Corp.</u>, 985 F. Supp. 2d 291, 318 (N.D.N.Y. 2013) (citing <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990)). At the pleading stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under <u>McDonnell Douglas</u> in the initial phase of the Title VII litigation." <u>Id.</u> at 316. The Complaint readily meets this standard, both because the knowledge of Di Stefano and Haelen is imputed to the Fund as a matter of law and, in any event, Meagher's complaints to Lais were sufficient.

---

[5] To the extent that Defendants suggest that Meagher must allege an adverse employment action, they are incorrect. See <u>Bunda v. Potter</u>, 369 F. Supp. 2d 1039, 1054 (N.D. Iowa 2005) (noting that "when a hostile environment claim is at issue, it is the hostile environment itself that is the adverse change in the terms or conditions of the plaintiff's employment, which makes harassment 'actionable' under Title VII") (citation omitted).

Contrary to Defendants' suggestion, "'Complaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language.'" Bader, 985 F. Supp. 2d at 318 (citation omitted).  The court's rulings at the summary judgment stage in Bader bear particular note here.  See id. at 322 (noting as to 2009 complaint that "[w]hile Plaintiff failed to explicitly invoke 'discrimination,' her complaints about severe mistreatment by four male supervisors and her reference to her many years of service and recently worsening conditions plausibly constitute references to gender and age discrimination" and as to a 2010 complaint, "Plaintiff states that she is complaining about a 'hostile workplace' and 'ongoing harassment,' terms that are often used in conjunction with gender discrimination").

 Defendants focus on the substance of Meagher's complaints to Lais, but the knowledge of Haelen and Di Stefano is alone sufficient to deem the Fund on notice of Meagher's protected activity.  The Second Circuit has rejected the idea that "anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity."  Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 147-48 (2d Cir. 2010) (citations omitted); see also Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63-64 (2d Cir. 1998) ("An official's knowledge will be imputed to an employer when: '(A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.'") (quoting Torres, 116 F.3d at 636-37).  The knowledge of Di Stefano and Haelen plainly must be imputed to the Fund under these standards. Di Stefano was not only Meagher's direct supervisor, but the chief legal officer of the Fund. Haelen was the chief administer of the Fund.  Moreover, they indisputably had knowledge of the conduct at issue, given their direct participation in it.  As detailed at length in Section I, above,

18

that conduct manifestly concerned Meagher's treatment as a mother with young children.  As to Haelen, Meagher also directly complained to him, and he acknowledged his awareness of the conduct of which she was complaining.  (Complaint ¶¶ 74-77.)

Even apart from the direct knowledge of Di Stefano and Haelen, the complaints to Lais were sufficient.  Meagher complained to Lais with a March 18, 2016 voicemail "[r]eferencing the hostile conduct and the Fund's Anti-Bullying Policy" and "summarized the conduct to which Di Stefano had subjected her and asked that Lais investigate it."  (Complaint ¶ 78.)  She then met with Lais on March 30, 2016 and "provided Lais a detailed written chronology of her interactions in the preceding months."  (Complaint ¶ 84.)  The summary of the conduct set out above was sufficient to place the Fund on notice, and Meagher was not required to use the terms "gender" or "gender plus."  Bader, 985 F. Supp. 2d at 385.  She plainly complained of her being subjected to a hostile environment based on her being a mother with young children.   The allegations are more specific than those upheld in Bader at the summary judgment stage.

By contrast, in neither of the two cases cited by Defendants did the plaintiff provide any complaints even suggesting gender discrimination.  See Grant v. N.Y.S. Office for People with Developmental Disabilities, 2013 U.S. Dist. LEXIS 107565, at **26-67 (E.D.N.Y. July 30, 2013) ("All plaintiff alleged is that on November 6, 2011, two (2) days after Therezo had issued him a 'write-up,' he 'complained to union representative . . .' and that his complaints pertained to 'his employment conditions.'");  Brumell v. Webster Cent. Sch. Dist., 2009 U.S. Dist. LEXIS 7644, at **13 (W.D.N.Y. Jan. 29, 2009) (plaintiff said to supervisor, "I don't know why you don't like me" and said "that 'you treat me differently than you do other people around here.  I don't know what I'm doing wrong . . . .'").

As such, the Complaint readily pleads the "protected activity" element, and there is no basis to dismiss the retaliation claim.

## III.   PLAINTIFF PLEADS A VALID EQUAL PROTECTION CLAIM

There is no basis to dismiss the Equal Protection claim (Third Cause of Action).  The Complaint alleges that Defendants discriminated against Meagher on account of her gender and family status.  (Complaint ¶ 119.)  For all the reasons set forth in Section I, above, the Complaint sets out valid claims for gender discrimination.  As <u>Back</u> makes clear, the precise theory that Plaintiff advanced here can be asserted pursuant to Section 1983.  Indeed, Defendants acknowledge that the Title VII and Equal Protection claims are analyzed under the same framework.  (Def. Mem. at 14.)  To the extent that the Complaint pleads "family status" as a basis for liability, Plaintiff acknowledges that such liability would arise to the extent that "family status" is incorporated into a "gender plus" showing.

## IV.   PLAINTIFF PLEADS A VALID FIRST AMENDMENT RETALIATION CLAIM

Defendants seek dismissal of the First Amendment retaliation claim (Fourth Cause of Action) on the ground that the speech at issue was not of "public concern" and therefore not protected by the First Amendment.  In fact, the Second Circuit has expressly stated that "[w]e view concerns raised to the government about the lawfulness of public officials' actions as implicating a matter of public interest . . . ."  <u>N.Y.S. Law Officers Union v. Andreucci</u>, 433 F.3d 320, 330 (2d Cir. 2006).  Meagher's statements addressed the actions of government actors and fall squarely within the definition of "public concern."

Meagher's statements fall into two categories.  First, the Fund's non-compliance with the 1999 Resolution addressed a matter of import not only to Meagher, but to the Fund's management confidential employees generally.  Moreover, it addressed a matter of compliance

with a resolution of the Fund's Board of Trustees relating to employee compensation.  Second, the Fund's non-compliance with its own procedures in connection with the conduct of Di Stefano, similarly relates to matters beyond Di Stefano's conduct toward Meagher.  Rather, the statements concerned the compliance of the Fund's management with its own policies.

Both categories of statements addressed the compliance of Fund management with policies and procedures that implicated the compensation and working conditions of Fund employees and therefore addressed matters of public concern.  See Andreucci, 433 F.3d at 330 (statement that undersheriff "was disciplining corrections officers in an unlawful manner . . . . related to a matter of public concern") (citation omitted); Wallace v. Suffolk County Police, Dep't, 2007 U.S. Dist. LEXIS 98745, at *21  (E.D.N.Y. Feb. 5, 2007) (statements addressed to "the training, equipment and morale of Emergency Services Unit addressed matters of public concern).  Defendants' reliance upon Adams v. N.Y. State Educ. Dep't, 2010 U.S. Dist. LEXIS 15635 (S.D.N.Y. Feb. 23, 2010) is therefore misplaced.  There, the plaintiff attempted to rely solely upon complaints concerning "how the [Department of Education] treated her."  Id. at **82-83.  Here, by contrast, Meagher's statements addressed more broadly the Board's compliance with the 1999 Resolution and its compliance with policies.

Defendants' assertion that Meagher's statements were made pursuant to her official duties lacks merit.  Defendants do not cite in any way how statements concerning the Fund's failure to comply with policies and procedures were encompassed within Meagher's official duties.  There is simply no basis to make such a finding here.  See, e.g., Wallace, 2007 U.S. Dist. LEXIS 98745, at **17-18 (distinguishing between police officer's filing of injured employee report pursuant to official duty and plaintiff's "allegations that the [report] was forged and

21

omitted injuries to his back and leg and of improper training and failure to follow rules and procedures, none of which constitutes speech made pursuant to Plaintiff's official duties").

Similarly inapposite is Defendants' assertion that Meagher made her statements to supervisors.  While the context of a statement is one relevant factor, "'[t]he mere fact that a public employee chooses to discuss privately his concerns with his employer as opposed to expressing his view publicly does not alter the analysis [of whether a statement relates to a matter of public concern].'"  Wallace, 2007 U.S. Dist. LEXIS 98745, at *23.  Moreover, Meagher directed her comments to the most senior personnel in the Fund.

Under all of the circumstances, Meagher has pleaded a valid First Amendment claim.

## V.   PLAINTIFF PLEADS A VALID DUE PROCESS CLAIM

The Complaint pleads a substantive due process claim (Fifth Cause of Action) based on Defendants' arbitrary denial of compensation guaranteed by the 1999 Resolution.  Defendants offer nothing other than conclusory assertions and provide no basis to dismiss the claim.

It is true that substantive due process claims address government conduct that "shocks the conscience," but the case law applying the standard illustrates that the bar is not nearly as high as Defendants suggest.  As the Second Circuit has explained, "The shocks-the-conscience test is necessarily imprecise."  O'Connor v. Pierson, 426 F.3d 187, 203 (2d Cir. 2005).  The court noted that "whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken."  Id.  In fact, in O'Connor, the plaintiff was a school teacher who had been placed on medical leave by the board of education; the board later allowed plaintiff to return, but only subject to his execution of a broad release of mental health records.  The Second Circuit reversed the district court, holding that "whether the Board's actions were conscience-shocking" could not be resolved at the summary judgment

stage, id. at 203, and noting that the relevant question was whether the Board "acted out of spite, or to keep O'Connor from teaching by whatever means necessary . . . ." Id. at 204.

As O'Connor makes clear, arbitrary actions in the public employment context support substantive due process claims. See also Burns v. Cook, 458 F. Supp. 2d 29, 42 (N.D.N.Y. 2006) (school employee who alleged numerous adverse employment actions, including unauthorized sharing of her confidential medical records, stated substantive due process claim); Dillon v. Boyce, 1995 U.S. Dist. LEXIS 21449, at **5-6, 14 (E.D.N.Y. Mar. 14, 1995) (holding that physician-resident stated substantive due process claim based on, among other things, alleged improper revocation of privileges and "bad-faith evaluations of her performance").

The Complaint alleges precisely the sort of arbitrary actions carried out intentionally to deprive her of her rights under the 1999 Resolution. It alleges clearly that (i) Meagher requested compensation pursuant to the 1999 Resolution; (ii) Defendants denied the request; and (ii) offered no rationale for refusing to follow the 1999 Resolution, and instead cited an inapposite provision of the employee handbook that did not purport to rescind the 1999 Resolution. (Complaint ¶ 40.) Moreover, when Meagher further protested, Di Stefano instructed her not to record on her time sheets any time worked in excess of her full-time week. (Complaint ¶ 41.) Added to these allegations are Defendants' many other actions detailed above, including arbitrary, bad-faith assessments of her work and a series of arbitrary and hostile actions aimed at her, all supporting an inference of intentional conduct. These allegations are more than sufficient to plead a substantive due process claim. See O'Connor, 426 F.3d at 204.

Defendants rely on facially inapposite cases. (Def. Mem. at 20.) See DeMartino v. N.Y. State Dep't of Labor, 167 F. Supp. 3d 342, 368-68 (E.D.N.Y. 2016) (contractor alleged that agencies conducted baseless wage and hours investigation); Cohn v. New Paltz Cent. Sch. Dist.,

363 F. Supp. 2d 421, 434 (N.D.N.Y. 2005) (student challenged application of student code of conduct in school disciplinary hearing relating to firearms). Moreover, the fact that the 1999 Resolution was in place prior to Meagher's employment is irrelevant. The fact is that it created a right to compensation that Defendants abridged in an arbitrary fashion. See Soundview Assocs. v. Town of Riverhead, 725 F. Supp. 2d 320, 337 (E.D.N.Y. 2010) (sustaining substantive due process claim of a golf course that alleged that the defendant town had arbitrarily denied an application for a permit to construct a health spa; the plaintiff had a vested property right to construct the spa pursuant to a 1982 special permit and alleged "that the defendants had no legitimate reason for their decision to deny plaintiff's applications[.]").

## VI.    PLAINTIFF PLEADS VALID NEW YORK STATE HUMAN RIGHTS CLAIMS

In addition to seeking parallel dismissal of the NYSHRL claims based upon gender and retaliation, Defendants seek dismissal of the NYSHRL claims based on "familial status." As Defendants acknowledge, the NYSHRL was amended on January 19, 2016 to include "familial status" as a basis for a claim of discrimination. (Def. Mem. at 21.) Defendants do not dispute that the Complaint's allegations implicate "familial status," as defined by New York Human Rights Law § 292.26, but they insist that the Complaint only alleges a refusal to accommodate Meagher's familial status. As explained at length in Section I, above, however, the Complaint alleges a hostile work environment motivated by Meagher's status as a woman with young children. While the backdrop to the hostile conduct included Meagher's modest requests with regard to her schedule, the claim is one based upon a hostile environment.

Defendants also repeat their argument that the Complaint fails to allege that Defendants acted "because of" the discriminatory motive. For all of the reasons set forth in Section I, above,

the Complaint manifestly pleads causation.   As explained therein, the Complaint recited

numerous explicit references to Meagher's familial status.

Finally, Defendants assert that conduct prior to January 19, 2016 "cannot serve as the

basis for an action under New York law under this category."  (Def. Mem. at 22.)  As there are

more than adequate post-January 19, 2016 actions that support the allegations, there is no need

for the Court to reach the issue at this stage.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court deny Defendants'

motion to dismiss in its entirety, with such other and further relief as the Court may award.

Dated: December 4, 2017
      Albany, New York

TABNER, RYAN & KENIRY, LLP

s/Thomas R. Fallati
Bar No. 515267
*Counsel for Plaintiff*
TABNER, RYAN & KENIRY, LLP
18 Corporate Woods Blvd.
Albany, New York 12211
Telephone: (518) 512-5307
Facsimile: (518) 465-5112
trf@trklaw.com